*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0371p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

GREGORY TUCKER,

    *Plaintiff-Appellee,*

   *v.*

CITY OF RICHMOND, KENTUCKY; ANN DURHAM, Mayor, in her individual capacity; SAM MANLEY, in his individual capacity; CHARLES DEBORD, in his individual capacity; KENNETH CALDWELL, in his individual capacity,

    *Defendants-Appellants.*

No. 03-6336

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 02-00064—Jennifer B. Coffman, District Judge.

Argued:  August 10, 2004

Decided and Filed:  October 28, 2004

Before:  KEITH, MARTIN, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Douglas L. McSwain, STURGILL, TURNER, BARKER & MOLONEY, Lexington, Kentucky, for Appellants.  Michael Dean, LAW OFFICES OF MICHAEL DEAN, Irvine, Kentucky, for Appellee. **ON BRIEF:** Douglas L. McSwain, Charles D. Cole, Andrew DeSimone, STURGILL, TURNER, BARKER & MOLONEY, Lexington, Kentucky, for Appellants.  Michael Dean, LAW OFFICES OF MICHAEL DEAN, Irvine, Kentucky, for Appellee.

_____

## OPINION

_____

  BOYCE F. MARTIN, JR., Circuit Judge.  Gregory Tucker filed claims pursuant to 42 U.S.C. § 1983 against the City of Richmond, Kentucky, and against the following City officials and employees: Mayor Ann Durham, Police Chief Charles DeBord, Assistant Police Chief Kenneth Caldwell and Police Officer Sam Manley. (Although there is some discrepancy in the briefs and the joint appendix regarding the correct spelling of Chief DeBord's name, we have adopted the spelling used in the defendants' appellate brief.) Tucker alleged that the individual defendants unconstitutionally retaliated against him for exercising his First Amendment rights and that the City maintained an unconstitutional policy of retaliating against those

1

who criticize City officials. The individual defendants appeal the district court's ruling that they are not entitled to qualified immunity. Additionally, the City purports to appeal the district court's denial of its motion to dismiss and/or for summary judgment, though Tucker maintains that this Court lacks jurisdiction over the City's appeal. For the reasons that follow, we hold that the individual defendants are entitled to qualified immunity because Tucker has failed to demonstrate a constitutional violation. We also exercise pendent jurisdiction over the City's appeal and hold that the City is entitled to judgment as a matter of law. We therefore VACATE the district court's judgment and REMAND with instructions to award judgment in favor of all defendants.

## I.

Tucker was a vocal critic of various public officials in the City of Richmond, Kentucky. Some of his criticisms were reflected in flyers that he distributed across the City alleging that certain public officials, including Mayor Ann Durham, had engaged in various forms of official misconduct. All defendants have conceded that these flyers constitute protected speech under the First Amendment. Tucker began distributing these constitutionally-protected flyers in March or April of 2000, but there is some dispute as to when he stopped distributing them. Tucker stated in his deposition that he distributed the flyers until the fall of 2001, but he indicated in a later affidavit submitted in opposition to the defendants' motion for summary judgment that he actually stopped distributing the flyers earlier, in the late fall or early winter of 2000. No criminal charges were filed with respect to the protected flyers.

Beginning in April or May of 2000, a second series of flyers appeared across the City of Richmond. Unlike the protected flyers, which charged official misconduct, these flyers accused certain City officials of "private immorality, such as drug abuse, adultery, or pedophilia." It is undisputed that these flyers are not constitutionally protected; in fact, a criminal investigation was launched as soon as the first of these flyers appeared. The distribution of the unprotected flyers ceased in April 2001. On May 10, 2001, Tucker and two of his associates, James "Crazy Snake" Blake and Steven M. Womack, were indicted on charges stemming from their involvement in distributing these flyers. While Blake and Womack were found guilty, Tucker was ultimately acquitted.

Tucker alleges that he was subjected to harassment and retaliation by the individual defendants as a result of his distribution of the constitutionally-protected flyers concerning official misconduct and corruption. Although his allegations are quite vague and generalized, it appears that there are seven particular alleged actions by the individual defendants about which he complains:

(1)     police officers conducted "poster patrols" throughout the Richmond area searching for individuals putting up posters, and Tucker was named as a suspect in connection with those patrols;

(2)     police officers conducted patrols throughout the subdivision in which Tucker lived;

(3)     Assistant Police Chief Caldwell interviewed some of Tucker's college professors in an effort to gain more information about him;

(4)     Officer Manley forcibly searched Tucker and threatened him with arrest on one occasion as he entered City Hall;

(5)     Officer Manley directed Officer Teresa Culton to go to the Madison County Clerk's office to investigate how a member of the public would go about gaining access to public tax records;

(6)     during a speech in a City Commission meeting, Mayor Durham mentioned Tucker's name, among others, saying that "[w]e should never have to be insulted or threatened

by the Kay Jones[es], the Steve Womacks, the Jim Blakes, the Greg Tuckers, the Dwayne Roadens of this World . . . .";

(7)     following Tucker's filing of an ethics complaint over what he perceived to be improper conduct by City officials, the City adopted an ordinance that requires a party who files a frivolous ethics complaint to pay the attorneys' fees of the accused official, and Mayor Durham voted for this ordinance.

Tucker alleges, and Police Chief DeBord concedes, that by virtue of his position, Chief DeBord is responsible for all of the police activity about which Tucker complains. It is also alleged that Mayor Durham, in addition to making a comment about Tucker and voting for the ordinance, personally ordered or authorized at least some aspects of the police investigation.

The individual defendants and the City collectively filed a motion to dismiss or, in the alternative, for summary judgment. The individual defendants argued that they were entitled to qualified immunity, and the City argued that Tucker had failed to allege a municipal custom or policy that caused a deprivation of a constitutional right. The district court denied the motion in its entirety, ruling that the individual defendants were not entitled to qualified immunity and that the City was not entitled to dismissal. This interlocutory appeal followed.

## II.

### A. *INDIVIDUAL DEFENDANTS' APPEAL*

The sole question presented in the individual defendants' interlocutory appeal is whether the district court erred in ruling that they were not entitled to qualified immunity. We review de novo the district court's denial of a defendant's motion for summary judgment on qualified immunity grounds. *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003). The doctrine of qualified immunity protects government officials who perform discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). In determining whether qualified immunity is warranted, we employ a three-part test:

The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is "whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights."

*Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*)).

The first step in the qualified immunity analysis involves a determination of whether Tucker has shown a violation of a constitutionally-protected right. Assuming that "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id.* at 205. Given that qualified immunity is an affirmative defense, "the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Harlow*, 457 U.S. at 815.

Tucker alleges that the individual defendants unconstitutionally retaliated against him for distributing the flyers alleging official corruption, which were protected under the First Amendment. The elements of a First Amendment retaliation claim are as follows:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*).

Although the defendants concede that the first element of the test is satisfied with respect to each of Tucker's claims, they maintain that the second and/or third elements are lacking. With regard to the second element, this Circuit – unlike some others – has held that "[t]he relevant question is whether the defendants' actions are '*capable* of deterring a person of ordinary firmness;' there is no requirement that the plaintiff show actual deterrence." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (quoting *Thaddeus-X*, 175 F.3d at 398). To satisfy the third element, the plaintiff must

> proffer evidence sufficient to raise the inference that his or her protected activity was a motivating factor for the adverse decision. Circumstantial evidence, like the timing of events or the disparate treatment of similar individuals, may support this inference. Once a plaintiff has met his or her burden of establishing that his or her protected conduct was a motivating factor behind the adverse conduct, the burden of production shifts to the defendant. If the defendant can demonstrate that it would have taken the same action in the absence of the protected activity, it has met its burden and is entitled to summary judgment if it can show affirmatively that there is no genuine issue in dispute.

*Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002) (citations and internal quotation marks omitted). "[S]ummary judgment for the defendant is proper only if the evidence is such that every reasonable juror would conclude that the defendant met its burden of showing that it would have taken the same action even in the absence of the protected conduct." *Id.* at 561 (citation omitted).

Because Tucker alleges that each individual defendant engaged in different acts of wrongdoing, we must analyze the claims against each individual defendant separately.

**1. *Officer Sam Manley***

Tucker's section 1983 claim against Officer Manley is premised upon two allegations: first, that Officer Manley forcibly searched and threatened him as he entered City Hall one day to inspect public records; and second, that Officer Manley directed Officer Teresa Culton to research how a member of the public would go about accessing public tax records. Each allegation is addressed in turn.

*a. The Search at City Hall*

Although Tucker's appellate brief describes Officer Manley's conduct in as egregious a manner as possible, his deposition paints a far more benign picture of the incident:

> [Officer Manley] said he needed to talk to me over there pointing at the hallway away from the receptionist desk. I asked him in reference to what. He said, I need to search you. I asked him why he needed to search me and he said he just had to. I asked him search me for what and he said for weapons I believe it was . . . . I asked him what his probable cause was and he didn't say anything from that point on. I asked him if I refuse the search what will he do, you know, what if I refuse I believe is what I said and he didn't say anything. So I just stood there for a few moments and he stood there. I asked him, you know, I don't want

> to be searched I believe it was and that's when he said we're going to have to go over here and I said what if I refuse and he said, I'll throw your ass in jail.

When asked what happened after this "conversation" took place, Tucker stated:

> He searched me . . . . He requested me to place my hands against the wall, spread my legs and he took the wand and went over me and then patted me down and that was about the extent. I guess maybe it lasted a minute or two minutes.

Tucker's own version of events fails to establish a constitutional violation. Tucker has failed to satisfy the second element of a First Amendment retaliation claim because Officer Manley's conduct does not rise to the level of adverse action that is capable of deterring a person of ordinary firmness from continuing to engage in the protected conduct. Individuals entering a government building such as City Hall necessarily encounter a variety of security measures, including the possibility that they might be searched, and the particular screening that Tucker underwent was not particularly intrusive. The fact that Tucker was searched for weapons, even if he observed no other individuals being searched at that time, simply would not deter a person of ordinary firmness in his position from continuing to distribute the protected flyers. Nor would Officer Manley's comment about throwing Tucker's "ass in jail" have such an effect; Tucker's deposition testimony reveals that this comment was offered only as a response to Tucker's inquiry about what would happen if he disobeyed Officer Manley's instruction to move out of the immediate security entrance area for further screening – and only after Tucker initially resisted being searched.

Tucker has also failed to satisfy the third element because there is simply no evidence that Officer Manley's conduct was motivated in any way by Tucker's distribution of the protected flyers. Moreover, Officer Manley has satisfactorily "demonstrate[d] that [he] would have taken the same action in the absence of the protected activity. . . ." *Arnett*, 281 F.3d at 561. The undisputed evidence indicates that security at City Hall was at a heightened level on the day of Tucker's visit because of an incident that occurred a few days earlier in which a projectile – thought to be a bullet – punctured a window in the Mayor's office.

Under these circumstances, Officer Manley's conduct in searching Tucker as he entered City Hall did not violate Tucker's constitutional rights and his actions were "objectively reasonable in light of the law existing at that time." *Harlow*, 457 U.S. at 815. Therefore, Officer Manley is entitled to qualified immunity in connection with his search of Tucker at City Hall.

### b. Tax Records Research

One of Tucker's protected flyers concerned the issue of unfair tax assessments. The flyer stated that information about tax assessments "can be examined in the Madison County Deed Vault Room and Madison County Property Tax Assessment Office." Tucker alleges that in response to this flyer, Officer Manley instructed another police officer, Teresa Culton, to go to City Hall to research "what a citizen would need to do in order to come in and to see a tax bill." Neither Officer Culton's research nor Officer Manley's alleged instruction constitutes an adverse action that is capable of deterring the protected activity. It is unclear how this assignment could have had any adverse effect on Tucker whatsoever. Therefore, Officer Manley is also entitled to qualified immunity for his alleged role in instructing Officer Culton to investigate tax records at City Hall.

## 2. *Assistant Police Chief Caldwell*

Tucker's claim against Assistant Police Chief Caldwell is based upon events that occurred on the campus of Eastern Kentucky University, where Tucker was a student. In particular, Tucker complains about the fact that Officer Caldwell interviewed some of Tucker's college professors and asked questions about him. According to Tucker, these interviews were conducted in retaliation for his distribution of the protected flyers. We disagree. The evidence unequivocally shows that Officer Caldwell's investigation at the University, including his interviews of Tucker's professors, were motivated by the appearance of an *unprotected* flyer on campus. For example, the chief of the University's public safety department called the police when the unprotected flyer was discovered and requested that a police investigation be undertaken into the matter. Officer Caldwell responded to this call. He went to the University building in which the flyer was discovered, attempted to locate witnesses and met with the chief of public safety. Additionally, after discovering that Tucker took classes in that building, Officer Caldwell testified that he decided to interview some of his professors, along with "other people in the . . . [b]uilding[,]" in an attempt to locate "a witness that may have seen [Tucker] or others posting this fl[y]er" and to determine if he "had any beef" with the subject of the flyer (in this case, a senator).

Officer Caldwell's actions were part of a legitimate police investigation into the unprotected flyers, which resulted in Tucker's indictment and criminal prosecution. Although Tucker baldly asserts that Officer Caldwell's true motivation was a desire to retaliate against Tucker for distributing the protected flyers, that assertion is unsupported by the evidence. Tucker alleges that the investigative file for the unprotected flyers referred to and contained copies of his protected flyers, but this fact, even if true, would not lead a reasonable juror to conclude that the police investigation into Tucker was motivated by his protected activities. It makes sense that a criminal investigation into the distribution of illegal flyers might include references to other flyers – even if legal – that may have come from the same source. In short, because Tucker has failed to satisfy the third element of a First Amendment retaliation claim, Officer Caldwell is entitled to qualified immunity with respect to the investigation that he conducted at the University.

## 3. *Police Chief Charles DeBord*

Tucker alleges that Police Chief DeBord authorized Officer Caldwell's interviews of Tucker's college professors, Officer Manley's search of Tucker and Officer Manley's direction to Officer Culton to investigate tax records at the Madison County Clerk's office, as well as the so-called "poster patrols" and the patrols of Tucker's subdivision. According to Tucker, Chief DeBord's involvement in each of these incidents renders him liable for retaliation in violation of the First Amendment. With respect to the first three alleged incidents, we have already determined that no constitutional violation has occurred. Therefore, Chief DeBord is entitled to qualified immunity for his alleged role in these incidents. The question remains, however, whether Chief DeBord is entitled to qualified immunity in connection with his authorization of the poster patrols and the patrols of Tucker's subdivision.

As to these allegations, Tucker has failed to establish a constitutional violation because, again, the third element of the First Amendment retaliation standard is lacking. The evidence indicates that the patrols in question were conducted as part of the police investigation into the unprotected flyers, not the protected flyers. Tucker finds it particularly relevant that his subdivision, which the police allegedly patrolled, was located outside of the city limits. In the absence of any evidence indicating that the police are not entitled to patrol beyond city limits, however, we attach little significance to this fact. Because neither the poster patrols nor the patrols of Tucker's subdivision violated Tucker's First Amendment rights, Chief DeBord is entitled to qualified immunity for his role in sanctioning the patrols.

## 4. *Mayor Ann Durham*

Tucker's allegations against Mayor Durham are as follows: (1) she personally authorized some of the investigatory actions taken by the police; (2) during a speech in a City Commission meeting, she

mentioned Tucker's name, among others, saying that "[w]e should never have to be insulted or threatened by the Kay Jones[es], the Steve Womacks, the Jim Blakes, the Greg Tuckers, the Dwayne Roadens of this World . . . ."; and (3) following Tucker's filing of an ethics complaint over what he perceived to be improper conduct by City officials, Mayor Durham voted for, and the City adopted, an ordinance that requires a party who files a frivolous ethics complaint to pay the attorneys' fees of the accused official.

With regard to the first allegation, we have already held that none of the police activities complained of rose to the level of a constitutional violation. Therefore, Mayor Durham cannot be held liable for her role in authorizing any of the activities.

Mayor Durham's comment about Tucker, which apparently was made in response to some of the protected flyers' allegations of public corruption, does not constitute an adverse action that is capable of the requisite chilling effect. The comment merely indicated Mayor Durham's view that "we should never have to be insulted or threatened" by people who make allegations such as Tucker made in the protected flyers. It conveyed no threat and simply could not have deterred Tucker or anyone else from engaging in constitutionally-protected speech. Therefore, Mayor Durham is entitled to qualified immunity for this comment.

Finally, Mayor Durham is entitled to absolute immunity with regard to her vote on the ordinance providing that a party who files a frivolous lawsuit ethics complaint must pay attorneys' fees to the accused official. "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 376, 376 (1951)). Absolute immunity extends to local mayors who are acting in official "legislative capacit[y]," and passing an ordinance is an example of an action taken in official legislative capacity. *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989).

## B. *CITY'S APPEAL*

As discussed, Tucker has also filed a section 1983 claim against the City, alleging that the City maintained an unconstitutional policy of retaliating against individuals who criticized City officials. The City purports to appeal the district court's denial of its motion to dismiss this claim or, in the alternative, for summary judgment. It is undisputed that the City's appeal is not appealable as a collateral order, but the City urges us to exercise pendent jurisdiction over its appeal. The exercise of pendent jurisdiction, while discretionary, is appropriate "where the appealable and non-appealable issues are 'inextricably intertwined.'" *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157-58 (6th Cir. 1996). The City's appeal is inextricably intertwined with the individual defendants' interlocutory appeal because there can be no municipal liability under section 1983 for maintaining a policy of unconstitutionally retaliating against individuals who exercise their First Amendment rights when no such unconstitutional retaliation has actually occurred. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) (citations omitted) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."). In light of our holding that Tucker has suffered no unconstitutional retaliation, his claim against the City must fail.

## III.

For these reasons, the district court's judgment is VACATED and the case is REMANDED for the entry of judgment in favor of all defendants.